**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 23-1090**

───────────

ALEJANDRA MONTESINOS CISNEROS,

Petitioner,

v.

TODD BLANCHE, ACTING ATTORNEY GENERAL,

Respondent.

───────────

On Petition for Review of an Order of the Board of Immigration Appeals.

───────────

Argued: October 22, 2025                           Decided: July 17, 2026

───────────

Before AGEE, THACKER, and RICHARDSON, Circuit Judges

───────────

Petition for review denied by published opinion. Judge Richardson wrote the opinion, in which Judge Agee joined. Judge Thacker wrote a dissenting opinion.

───────────

**ARGUED:** Jennifer Campos, GEORGETOWN UNIVERSITY LAW CENTER, for Petitioner. Jonathan Aaron Robbins, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Erica Hashimoto, Director, Salvatore Mancina, Supervising Attorney, Loro Schreiner, Student Counsel, Jerry Blake Blevins, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Petitioner. Brett A. Shumate, Assistant Attorney General, Zoe J. Heller, Senior Litigation Counsel, Office of Immigration Litigation, Civil

Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

RICHARDSON, Circuit Judge:

Alejandra Montesinos Cisneros, a native of El Salvador, seeks cancellation of removal under 8 U.S.C. § 1229b(a). That statute requires, among other things, that the applicant have "resided in the United States continuously for 7 years after having been admitted in any status." 8 U.S.C. § 1229b(a)(2). We must decide whether Cisneros was "admitted in any status" when she crossed the border on December 14, 1994, under the Executive's Deferred Enforced Departure (DED) program. The immigration officer stamped "Admitted" in Cisneros's passport but then handwrote "DED until Dec. 30, 1994" within that stamp.

We hold that Cisneros was not "admitted in any status" on December 14, 1994. Even assuming she was "admitted" by virtue of the officer's stamp when she returned, she was not admitted "in any status" because DED is not an immigration status. Her petition for review is denied.

I.      BACKGROUND

Cisneros is a native citizen of El Salvador who first came to the United States without inspection in November 1985. She later applied for and was granted Temporary Protected Status (TPS) under 8 U.S.C. § 1254a.[1] When the TPS designation for El Salvador ended in 1992, President Bush—and later, President Clinton—delayed the deportation of Salvadorans who had registered for TPS by allowing them to benefit from

---

[1] TPS allows aliens to remain in the United States if their home country is in a state of upheaval due to an ongoing armed conflict, natural disaster, or similar event. 8 U.S.C. § 1254a(a)–(b).

Deferred Enforced Departure (DED).[2]  In 1994, Cisneros received a Form I-512 under the DED program, which authorized her to travel and seek return without abandoning her DED-based protection, and she subsequently traveled outside the United States with this document on November 17, 1994.  Upon returning to the United States on December 14, 1994, an immigration officer at Dulles International Airport stamped Cisneros's passport with the pre-marked word "Admitted" and handwrote "DED until Dec. 30, 1994" within that stamp.  J.A. 253, 267.

Cisneros later traveled abroad twice more using DED documents, returning to the United States on April 13, 1996, and December 28, 1997.  On each of these trips back, the immigration officer stamped Cisneros's passport "Paroled" and wrote either "DED" or "I-512."

On November 29, 2006, Cisneros obtained lawful permanent resident status (LPR) under the Nicaraguan Adjustment and Central American Relief Act (NACARA).

In 2012, Cisneros was arrested and pleaded guilty to falsely identifying herself to law enforcement, in violation of Va. Code § 19.2-82.1.  Then in 2013, Cisneros was arrested and pleaded guilty to petit larceny, in violation of Va. Code § 18.2-96.

In September 2016, the Department of Homeland Security (DHS) issued a Notice to Appear, charging Cisneros as subject to removal under 8 U.S.C. § 1182(a)(2)(A)(i)(I), as an alien convicted of a crime involving moral turpitude (CIMT).  At a hearing before an

---

[2] Granted at the President's discretion, DED is discretionary executive forbearance that defers removal for a specified period.  *See* Extension of Deferral of Enforced Departure for Nationals of El Salvador, 58 Fed. Reg. 32,157-01 (June 8, 1993).

immigration judge on September 26, 2017, Cisneros conceded removability and applied for cancellation of removal under § 1229b(a).[3] Her eligibility turned on whether she met the statute's requirement of seven years' continuous residence "after having been admitted in any status." § 1229b(a)(2).

Cisneros conceded that her period of continuous residence *ended* when she committed petit larceny in February 2013. *See* 8 U.S.C. §§ 1229b(d)(1),[4] 1182(a)(2)(A)(i)[5] (deeming a period of continuous residence to end when the alien has committed a removable offense, such as a CIMT[6]). She argued, however, that the clock *started* on

---

[3] "The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
> (1) has been an alien lawfully admitted for permanent residence for not less than 5 years,
> (2) has resided in the United States continuously for 7 years after having been admitted in any status, and
> (3) has not been convicted of any aggravated felony."
8 U.S.C. § 1229b(a).

[4] "Any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) of this title, or . . . when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest." 8 U.S.C. § 1229b(d)(1).

[5] "[A]ny alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime . . . is inadmissible." 8 U.S.C. § 1182(a)(2)(A)(i)(I).

[6] Cisneros concedes that this question has been foreclosed by this Court's holding in *Chavez v. Bondi*, 134 F.4th 207, 222 (4th Cir. 2025), that Virginia petit larceny *is* a CIMT. Her only argument on this question is that the issue should be reviewed by the Supreme Court or by this Court sitting en banc. But we are bound by *Chavez*.

5

December 14, 1994, nearly 20 years earlier, when the immigration officer stamped "Admitted" in her passport.

At the November 5, 2018, merits hearing, the government initially conceded that Cisneros had accrued seven years of continuous residence but withdrew that concession before the hearing concluded.

On December 14, 2018, the immigration judge denied Cisneros's application, concluding that she was not "admitted in any status" when she returned under DED on December 14, 1994. The IJ reasoned that Cisneros was paroled rather than admitted, and that DED is not an immigration status within the meaning of § 1229b(a)(2). The IJ found that Cisneros was not "admitted in any status" until she adjusted to LPR status on November 29, 2006, which left fewer than seven years before her February 2013 offense. The Board of Immigration Appeals dismissed Cisneros's appeal on December 29, 2022, affirming the IJ's reasoning.

Cisneros timely filed a pro se petition for review on January 26, 2023. *See* 8 U.S.C. § 1252(b)(1). Venue is proper because the proceedings took place in Arlington, Virginia. *See Herrera-Alcala v. Garland*, 39 F.4th 233, 242–43 (4th Cir. 2022) (citing 8 U.S.C. § 1252(b)(2)).

## II.    DISCUSSION

Cancellation of removal is a discretionary form of relief. *See* 8 U.S.C. § 1229b(a). We have jurisdiction to review only questions of law arising from the denial of Cisneros's application. § 1252(a)(2)(D). The IJ and Board's interpretation of the term "admitted in any status" in § 1229b(a)(2) is "a question of law that we review de novo." *Mohamed v.*

6

*Holder*, 769 F.3d 885, 888 (4th Cir. 2014).[7]  And "[w]here, as here, the [Board] has adopted an IJ decision and issued its own decision, we review both rulings."  *Xing Yang Yang v. Holder*, 770 F.3d 294, 302 (4th Cir. 2014); *see also Cabrera v. Garland*, 21 F.4th 878, 883 (4th Cir. 2022).

Our review is limited to whether the clock "started" on December 14, 1994.[8]  In other words, was she "admitted in any status" on that date?  *See* § 1229b(a)(2).  We hold that she was not.  We explain in three steps: first, what "status" means in the INA; second, why DED is not one; and third, why Cisneros's contrary arguments fail.  Because this conclusion makes her statutorily ineligible for cancellation of removal, we deny her petition for review.

---

[7] In its brief, the government suggests that we review the agency's eligibility determinations for cancellation of removal—including findings of continuous physical presence—for *substantial evidence*.  Respondent's Br. at 15 (citing *Ramos v. Holder*, 660 F.3d 200, 203 (4th Cir. 2011)).  This is incorrect.  In *Patel v. Garland*, the Supreme Court clarified that § 1252(a)(2)(B)(i)'s jurisdictional bar extends to factual findings underlying determinations of a petitioner's eligibility for discretionary relief—including findings made in the course of deciding eligibility for relief under § 1229b.  *See* 596 U.S. 328, 347 (2022).  But the dispositive question here is legal, and thus falls within § 1252(a)(2)(D)'s carve-out.  So we review it *de novo*.

The question, in particular, asks us to interpret the INA.  Before *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), we might have afforded *Chevron* deference to the Board's interpretation of "admitted in any status," because this interpretation relied on an opinion by a three-member Board panel in *Matter of Castillo Angulo*, 27 I. & N. Dec. 194, 198–202 (BIA 2018).  Now, however, courts—not agencies—must resolve statutory ambiguities "by exercising independent legal judgment."  *Loper Bright*, 603 U.S. at 401.  So we must interpret §§ 1101(a)(13)(A) and 1229b(a)(2) for ourselves, using the traditional tools of statutory construction.  *Id.*

[8] Cisneros concedes that our precedent in *Chavez* precludes any argument that the clock "stopped" in February 2013.  *See* 134 F.4th at 222.

7

A.    Cisneros Was Not Admitted "in any status"

Assuming that Cisneros's ingress on December 14, 1994, constituted an "admission," it was not an admission "in any status." 8 U.S.C. § 1229b(a)(2). She arrived with the same immigration status she had when she left the United States: none.

### 1.    "Status" under the INA denotes membership in a legislatively defined immigration classification

Admission and status are distinct concepts. *See Sanchez v. Mayorkas*, 593 U.S. 409, 414 (2021). Admission is a historical event—the act of lawfully entering the country after inspection and authorization by an immigration officer. 8 U.S.C. § 1101(a)(13)(A). Status is different. Status is a positive-law construct. It may be held only by those who fit a legislatively defined class. It carries legal entitlements the government must recognize until the conditions prescribed by law are no longer met.

"Status" had precisely this meaning when Congress enacted the INA in 1952. Black's Law Dictionary defined it as "[s]tanding; state or condition. . . . The rights, duties, capacities and incapacities which determine a person to a given class. A legal personal relationship, not temporary in its nature nor terminable at the mere will of the parties, with which third persons and the state are concerned." *Status*, Black's Law Dictionary 1580 (4th ed. 1951);[9] *see also Status*, Bouvier's Law Dictionary 3129 (Francis Rawle rev. 8th

---

[9] The dissent reads Black's reference to "incapacities which determine a person to a given class" to mean that aliens without status form a class—"unlawful status"—by virtue of their shared incapacity to claim a right to be in the United States. Dissent at 32. That inverts the definition. The "incapacities" Black's describes are legal disabilities that flow *from* membership in an already-defined class. For example, a child's minor status—that is, membership in the class of people under eighteen—disables him from entering into non-voidable contracts. *See* Restatement (Second) of Contracts § 14 (A.L.I. 1981). Or, in an

8

ed. 1914) ("The rights, duties, capacities and incapacities which determine a person to a given class.").[10]  At the time of the INA's enactment, then, "status" was a matter of belonging to a defined class, with membership in that class creating a durable entitlement that is claimable against others, including the state.

The INA reflects precisely this understanding.  It is a taxonomy of statuses: Congress classifies aliens into defined categories—immigrants and nonimmigrants, refugees and asylees, LPRs and temporary visitors—and attaches to each a legally

---

earlier era, a married woman's status—her coverture—disabled her from contracting in her own name, owning property independently, and suing or being sued without her husband joined as a party, while simultaneously creating the capacity to bind his credit for necessaries.  1 William Blackstone, *Commentaries* *430 (1765).

So the law defines the class; rights and disabilities follow from membership.  The dissent proceeds backwards.  Each recognized status identifies the class of people who hold that status and then defines the terms of the law's relationship with them, *i.e.*, the class members' capacities and incapacities.  The dissent instead gathers everyone with whom the law has established *no* such relationship and treats that shared absence as a status of its own.  But, as we've just discussed, a status is "[a] legal personal relationship," Black's Law Dictionary 1580 (4th ed. 1951), and a group united only by the *lack* of any relationship is precisely the absence of what that definition requires, not an instantiation of it.  Moreover, a status must be "not temporary in its nature nor terminable at the mere will of the parties."  *Id.*  Yet presence at the Executive's sufferance *is* terminable at will, at any moment, for any reason.  The inability to claim any enduring legal position is not itself a legal position.

[10] *See also Status*, The New Century Dictionary 1832 (1952) ("[I]n law, the standing of a person before the law in the class of persons indicated by his or her legal qualities; the relation fixed by law in which a person stands towards others or the state."); *Status*, The Concise Oxford Dictionary of Current English 1234 (E. McIntosh rev. 4th ed. 1952) ("(Law) person's relation to others as fixed by law; position of affairs.").  For later formulations of the same legal sense, see *Status*, Oxford English Dictionary (2d ed. 1989) ("The legal standing or position of a person as determined by his membership of some class of persons legally enjoying certain rights or subject to certain limitations."); *Matter of Blancas-Lara*, 23 I. & N. Dec. 458, 460 (BIA 2002) ("'Status' is a term of art . . . .  It denotes someone who possesses a certain legal standing.").

9

cognizable entitlement to remain in the United States. Every immigration "status" recognized by the INA is thus a creature of statute. *Matter of Rotimi*, 24 I. & N. Dec. 567, 576 (BIA 2008) ("[T]he privilege of residing in this country [is] reflected in a recognized status such as that of nonimmigrant, refugee, or asylee, each of which is set out in the statute."); *see also Holder v. Martinez Gutierrez*, 566 U.S. 583, 587 (2012) (explaining that under § 1229b(a) "the alien must have lived in the United States for at least seven continuous years after a lawful admission, *whether as an LPR or in some other immigration status*") (emphasis added).[11]

The pattern for each of these statuses is the same: An alien who satisfies the eligibility criteria for a status receives a defined period of authorized presence, so long as he satisfies the conditions required to maintain that status. *See generally* 8 U.S.C. § 1101(a)(15)(A)–(V) (enumerating nonimmigrant statuses[12] and their attendant eligibility criteria, periods of authorized stay, conditions for maintenance, and grounds for deportability); § 1101(a)(20) (same, for LPR status); § 1157 (same, for refugees); § 1158 (same, for asylees); § 1254a (same, for holders of temporary protected status).

---

[11] Only Congress may create an immigration status. *See Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." (citations omitted)); *see also Fiallo v. Bell*, 430 U.S. 787, 792, 796 (1977).

[12] The nonimmigrant statutory scheme establishes the framework for temporary lawful presence tied to specific purposes (*e.g.*, work, study, tourism).

10

Thus, throughout the INA, "status" refers to membership in a specific, congressionally defined class. *See, e.g.*, 8 U.S.C. § 1101(a)(20) (defining LPR as "the status of having been lawfully accorded the privilege of residing permanently in the United States"); § 1254a (entitled "Temporary protected *status*") (emphasis added). It does not refer to a general description of the alien's legal condition. An alien must affirmatively fit into one of these legislatively defined categories to hold a "status"; an alien who occupies none of them holds no status at all. In the INA, status refers to membership in a statutory immigration classification, not merely to the lawfulness of one's presence in the United States.

### 2.    DED is not a "status"

There is no dispute that Cisneros was the beneficiary of DED when she crossed the border in December 1994. The question, then, is whether DED is an immigration "status" as required by § 1229b. It is not. DED is not a creature of the INA but a discretionary act of executive forbearance—a decision not to enforce the law against an alien who has no entitlement to be in the United States and is therefore removable. Forbearance of this kind does not create a status. Indeed, it presupposes the *absence* of one. The beneficiary of such forbearance remains in the country only at the government's sufferance, with no statutory entitlement that he can claim against it.[13] His presence in the country is permitted

---

[13] The Board recognized this principle decades ago (albeit in a somewhat different posture) in *Matter of Lok*: The government's forbearance from enforcing an alien's deportation "does not legalize the status of the beneficiary of the Government's forbearance. He remains in the United States at the sufferance of the Government, not under any lawful status accorded him by the Act." 18 I. & N. Dec. 101, 108–09 (BIA 1981) (emphasis added). *Lok* addressed a LPR whose lawful domicile under former

11

by executive grace alone, untethered to any class that Congress has defined in the INA.[14]

Resting on no statutory footing, his presence is "terminable at the mere will" of the executive, at any moment and for any reason. *Cf. Status*, Black's Law Dictionary 1580 (4th ed. 1951). Because the beneficiaries of such executive grace occupy no congressionally created category, they hold no entitlement that the law obliges the government to recognize. In other words, they lack status.[15] And a lack of status is not a status.

_____

§ 212(c) ceased to accrue once he became deportable, that is, an alien who *held* a recognized status and forfeited its lawfulness. As we explain, a DED beneficiary stands a step further removed: He never possessed an INA-recognized status at all. If forbearance cannot preserve the lawful presence of one who once held a recognized status, it cannot manufacture a status for one who never held any status at all.

[14] *See* Adjustment of Status; Certain Nationals of the People's Republic of China, 62 Fed. Reg. 63,249, 63,253 (Nov. 28, 1997) (codified at 8 C.F.R. pt. 245) ("Deferred action does not confer any immigration status on an alien, nor is it in any way a reflection of an alien's lawful immigration status. . . . Since deferred action is not an immigration status, no alien has the right to deferred action. It is used solely for the administrative convenience of, and in the discretion of, the Service and confers no protection or benefit on an alien. Deferred action does not preclude the Service from commencing removal proceedings at any time against an alien."); Press Release, U.S. Dep't of Homeland Sec., Secretary Napolitano Announces Deferred Action Process for Young People Who Are Low Enforcement Priorities (June 15, 2012) (explaining that "[t]he use of prosecutorial discretion [under DACA] confers no substantive right, immigration status, or pathway to citizenship" and that "[o]nly Congress, acting through its legislative authority, can confer these rights"); *see also* Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law Redux*, 125 Yale L.J. 104, 219–20 & n.319 (2015) ("[T]he Executive has created a variety of immigration non-statuses like deferred action that leave their recipients at the mercy of executive discretion."); Geoffrey Heeren, *The Status of Nonstatus*, 64 Am. U. L. Rev. 1115, 1129 (2015) ("If the government exercises its discretion and does not deport an unauthorized immigrant, what is that individual's status? The government would likely answer that such individuals have no status . . . .").

[15] For this reason, courts have repeatedly recognized that an alien who lacks a status as defined in the INA is "without status." *See, e.g.*, *United States v. Orellana,* 405 F.3d

This picture describes the situation of those who are present in the United States under DED.  DED is grounded in "the president's power to conduct foreign relations," not in any provision of the INA.  USCIS, *Deferred Enforced Departure*, https://www.uscis.gov/humanitarian/deferred-enforced-departure (last updated July 1, 2026) [https://perma.cc/3Y8H-EMB8].  It "is not a specific immigration status." *Id.*[16]  As one scholar puts it, DED has "no application process . . . let alone a formal hearing," leaving its beneficiaries "in a state of perpetual uncertainty"—the "paradigmatic" case of immigration "nonstatus."[17]  Heeren, *The Status of Nonstatus*, 64 Am. U. L. Rev. at 1129–

---

360, 370 (5th Cir. 2005); *Reyes-Melendez v. INS,* 342 F.3d 1001, 1002 (9th Cir. 2003); *Zheng v. Gonzales*, 422 F.3d 98, 111 (3d Cir. 2005); *Jiang v. Gonzales*, 425 F.3d 649, 652 (9th Cir. 2005); *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 964 (9th Cir. 2017).

[16] *See also* USCIS, *Adjudicator's Field Manual* § 38.2 (2026); USCIS, *Policy Manual*, Vol. 10, Pt. A, ch. 2, n.14 (2026); USCIS, *Affirmative Asylum Procedures Manual* 97 (Feb. 2025); *cf.* Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 4 (Dec. 5, 2024) (describing DED as "a temporary, discretionary, administrative stay of removal" with "no statutory basis").

[17] This also describes the situation of DACA beneficiaries, for example.  *See Brewer*, 855 F.3d at 964 (DACA recipients "enjoy no formal immigration status"); 62 Fed. Reg. at 63,253 ("Since deferred action is not an immigration status, no alien has the right to deferred action."); DHS Immigration and Customs Enforcement, Office of Detention and Removal, *Detention and Deportation Officers' Field Manual* § 20.8 (Mar. 27, 2006) ("[Because] deferred action is not an immigration status, no alien has the right to deferred action. It is used solely in the discretion of the [government] and confers no protection or benefit upon an alien.").

That deferred-removal programs like DACA or DED may create interests reviewable by the courts does not help Cisneros.  *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 18–19 (2020) (explaining that DACA's conferral of "affirmative immigration relief" created "an interest courts often are called upon to protect.").  The creation of reviewable interests does not imply the conferral of status under the INA, with an attendant substantive right to remain in the United States.  *See id.* at 16.  By contrast, TPS, while also a form of reprieve from removal, *is* status, because *Congress* said so in § 1254a.  That the Secretary may terminate a TPS designation does not dissolve this distinction.  Termination

32; *see also Jiang*, 425 F.3d at 652 (explaining that DED does not confer lawful immigration status on one who did not already possess such a status); *Zheng*, 422 F.3d at 111 (explaining that "DED is not an admission status" because it involves "the President simply order[ing] the Attorney General to defer deporting" foreign nationals). DED is forbearance, not status.

Because Cisneros returned to the United States as a DED beneficiary and nothing more, she was not admitted "in any status." She is thus ineligible for cancellation of removal under § 1229b(a)(2).[18]

### 3.      Cisneros's arguments to the contrary are unavailing

Relying on Fifth and Ninth Circuit precedent, Cisneros argues that "in any status" includes both "lawful" and "unlawful" immigration statuses. *See Tula Rubio v. Lynch*, 787

---

of TPS is not an act of executive will but the discharge of a statutory duty: Congress required the Secretary to review country conditions, to terminate by determining that the statutory "conditions for [the] designation" are no longer met, and to do so by published notice on a timetable Congress fixed. 8 U.S.C. § 1254a(b)(3)(A)–(B). *See also Mullin v. Doe*, No. 25–1083, 609 U.S. ___, ___ (2026) (slip op., at 3–4) (explaining that Extended Voluntary Departure—the predecessor to DED—made "the grant and termination of humanitarian relief . . . purely a matter of executive discretion," and that "[a]fter critics objected that [EVD] lacked proper guidelines or standards, Congress created TPS," a "regime [that] provided standards to govern the grant and termination of TPS") (cleaned up). But DED and DACA may be extended or withdrawn at the President's unfettered discretion because no statute defines their beneficiaries, supplies their conditions, or governs their termination. That congressional silence forecloses treating DACA or DED as immigration statuses.

[18] Notably, the dissent does not contend that DED is itself a status. On that much, we agree. The dissent instead contends that Cisneros was admitted in an "unlawful status," whether because her TPS had expired two years earlier or simply because she held no INA status at all when she was admitted. We address that contention below.

14

F.3d 288, 293 (5th Cir. 2015); *Saldivar v. Sessions*, 877 F.3d 812, 816 (9th Cir. 2017).[19]

She contends that because the INA repeatedly refers to both "lawful" and "unlawful" statuses, the word "status" without any qualifier must include both lawful and unlawful statuses. *See, e.g.*, 8 U.S.C. § 1255(c) (referring to "unlawful immigration status," "lawful status," and "lawful nonimmigrant status"). Thus, she claims that reading "status" to require lawfulness violates a "cardinal principle of statutory construction" and makes other provisions of the INA that use terms like "lawful status" "superfluous, void, or insignificant." *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). Cisneros also makes much of the difference in language between subsections (1) and (2) of § 1229b(a). *See also Tula Rubio*, 787 F.3d at 294–95; *Saldivar*, 877 F.3d at 818–19. Whereas § 1229b(a)(2) requires admission "in any status," § 1229b(a)(1) requires that the alien have been "lawfully admitted for permanent residence." 8 U.S.C. § 1229b(a).[20] From the narrower language of subsection (a)(1), Cisneros infers that "any status" in (a)(2) must sweep broadly enough to include unlawful statuses. She argues that the statute distinguishes between those with lawful permanent residence status under subsection (a)(1) and those who are merely admitted in *any* other status under (a)(2), by imposing different residency

---

[19] We recognize that our conclusion places us at odds with two of our sister circuits. While we weigh their reasoning carefully, we do not defer to it blindly.

[20] Subsection (a)(1)'s requirement of "lawful[] admi[ssion] for permanent residence" is not, as Cisneros's argument suggests, simply "admission" qualified by "lawful[ness]." This Court has held that the phrase is a statutorily defined term of art that "has nothing to do with 'admission' at all," referring "not to an applicant's *admittance* but instead to his *status*." *Azumah v. USCIS*, 107 F.4th 272, 276 (4th Cir. 2024) (emphasis in original). So the two subsections do not stand as parallel provisions differing only in whether admission is lawful.

15

requirements for each. *Compare* § 1229b(a)(1) (requiring five years of residency for those who have been "lawfully admitted for permanent residence"), *with* § 1229b(a)(2) (requiring seven years of residency for those "having been admitted in any status").

These arguments misconceive the question.[21]  The issue is not whether DED is a "lawful" status or an "unlawful" one; it is whether DED is a status *at all*.  As we have explained, it is not.  Cisneros's framing assumes the opposite—that DED is a status, just not a lawful one.  In other words, Cisneros presumes that the INA's references to "unlawful status" use the word "status" in some loose, nontechnical sense, to describe the situation of any alien present in the country—lawfully or not—without regard to that alien's membership in a defined status.  But when the INA speaks of "unlawful status," there is no reason to suppose that it is abandoning the technical sense of "status" that pervades the rest of the statute.  *See Martinez Gutierrez*, 566 U.S. at 587 (recognizing "status" as an immigration-law term); *United States v. Hansen*, 599 U.S. 762, 774–75 (2023) (explaining that a term of art in a statute generally assumes its technical meaning).  Rather, the phrase describes an alien who holds an enumerated status and asks whether the alien obtained and maintained that status in conformity with the law.  The "lawful" and "unlawful" qualifiers thus specify the alien's relationship to an INA-defined status; the word "unlawful" does not conjure a status that does not exist under the INA.

---

[21] The dissent says we read "status" to mean "lawful status."  Dissent at 32.  We do not.  That was the characterization of the government's argument in *Tula Rubio* and *Saldivar*; it is not ours.  Our holding is that "any status" means any *status*:  membership in some classification Congress defined.  Whether an alien holds a status and whether she holds it lawfully are different questions.  Cisneros fails at the first.

16

So "unlawful immigration status" does not simply sweep in everything that is *not* a lawful status and thereby include the absence of status altogether.  Rather, an "unlawful" status presupposes the existence of a status:  The phrase "unlawful immigration status" describes a recognized immigration status that the alien *unlawfully obtained* or *has violated*.  A student visa holder who fraudulently claimed university enrollment to obtain status holds a status that was never lawful.  Similarly, a student visa holder who fails to maintain a full course of study still holds a status, albeit one with which she has fallen out of compliance.

A DED beneficiary, by contrast, holds no INA-recognized status by virtue of DED—the program neither creates a classification nor places its beneficiary in one.  True, Cisneros once held a recognized status:  TPS.  But that status ended in 1992, when the designation for El Salvador terminated.  *See* 8 U.S.C. § 1254a(b)(3).  So when Cisneros presented herself at Dulles in December 1994, TPS provided no contemporaneous status, and DED supplied no replacement.  Section 1229b(a)(2) asks what status the alien was admitted "in."  To be admitted "in" a status, the alien must hold it at the moment of admission.  A status that has expired is not a status the alien holds in unlawful fashion; it is a status the alien no longer holds at all.  After June 1992, then, Cisneros held no status— she was simply an alien present in the United States without one.  And presence without status is not something an alien "holds"; it is a fact about where she is and therefore lasts only as long as the alien remains in the country, and ends when she leaves.

Congress understood this distinction.  In the same Act that created § 1229b(a)(2), Congress addressed the alien who remains "after the expiration of the period of stay

17

authorized," and it described such an alien's condition not as an unlawful *status*, but as unlawful *presence*.  8 U.S.C. § 1182(a)(9)(B)(ii).  So presence and status are different things.  Status is a legal classification created by Congress which an alien may occupy. Presence is a fact about where the alien is.  An alien can be present in the country without occupying any classification at all, whether her presence is unauthorized (as § 1182(a)(9)(B) contemplates) or authorized (as Cisneros was under DED).  Either way, the alien holds no *status*.  What § 1229b(a)(2) requires is status.  It asks not whether the alien was present (lawfully or otherwise), but whether she held a statutorily created status when admitted.  When Cisneros presented herself at Dulles in December 1994, she may have been lawfully *present* under DED, but she held no status:  none, lawful or unlawful.[22]

---

[22] The dissent responds that Cisneros remained here "in unlawful status," whether because her TPS had expired two years earlier or simply because she held no INA status when she was admitted.  The second theory is not really an argument about unlawful status. It simply repackages the contention—already rejected—that the absence of an INA status is itself a status "in" which an alien may be admitted.

For the first theory, the dissent invokes *Orquera v. Ashcroft*, 357 F.3d 413 (4th Cir. 2003).  But *Orquera* cannot carry the weight that the dissent wants it to.  To be clear, we do not deny that § 1255a speaks of aliens who "resided continuously in the United States in an unlawful status."  The question is what that phrase means.  And on that question, *Orquera* did not exercise its independent judicial judgment:  Because IRCA "does not define 'unlawful status' at all," we deferred under *Chevron* to the INS regulations implementing the amnesty program, 357 F.3d at 424–25, under which the agency "effectively index[ed] unlawful status to susceptibility to imminent deportation" "[i]n deciding who qualified for amnesty." *Id.* at 425.  The dissent concedes both points: *Orquera* "deferred to that definition pursuant to *Chevron*," and it does not "directly control[] this case."  Dissent at 35.  We agree.

What remains, then, is an administrative gloss addressing a different question— whose *presence* was unlawful enough to need legalizing—under a different statute concerned with unlawful residence, filtered through implementing regulations, and reviewed under a deference regime that *Loper Bright* has since interred. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).  Whatever *Loper Bright* leaves of *Orquera*'s holding as to § 1255a, *see id.* at 412, that does not mean we should adopt a

18

Cisneros also protests that "any" is an inherently expansive modifier. Even at its most expansive, "any" is confined to *a certain domain*: It sweeps broadly across the recognized categories of the relevant class without limitation to a particular member *of that class*. *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (explaining that "any" has "an expansive meaning" that is "not limited to" a specific subset). Here, "any *status*" means any of the immigration classifications that Congress has defined in the INA. "Any" broadens the range of qualifying statuses beyond, for example, permanent residency. But it still assumes that the alien has some status. It expands the class of statuses

deference-driven gloss on one program as the best reading of a different statutory provision.

And—*pace* the dissent's contention to the contrary—consistent usage is our ally: Throughout the INA, "status" is used to denote a defined classification, and if intra-INA usage is the measure, the most telling comparison is the Act that created § 1229b(a)(2) itself—IIRIRA—which described the condition of remaining without authorization as unlawful *presence*, not unlawful "status." *See* § 1182(a)(9)(B). So *Orquera* tells us nothing about the classification "in" which an alien is "admitted" under § 1229b(a)(2).

If anything, *Orquera* helps our reading. Both conditions it describes—a legal status that "has expired or otherwise terminated" and a legal status the alien "has violated"—presuppose a recognized status to expire or to violate. *Id.* "Unlawful status" there, as here, is parasitic on the statuses Congress created; it is not a freestanding classification that attaches to anyone the law would remove. Nor does *Orquera* say that expiration confers some further status that the alien holds from then on. A status that "has expired" is a status that has met its end; the phrase describes what happened to a classification that the alien once held, not one that she now occupies. Indeed, *Orquera* rejected the petitioners' argument that *violating* their visa terms placed them in "unlawful status," because they "technically remained under the auspices of an A-2 visa." *Id.* at 425 & n.7. Status turned on the objective existence of the classification, not on the alien's conduct or deportability. So too here: When Cisneros's TPS terminated, no classification remained—and none called "unlawful status" sprang up in its place. The dissent's argument does not fail because an expired status can never have downstream legal consequences. It fails, on our reading, because it treats an ended TPS status as the classification in which Cisneros was admitted two years later. Section 1229b(a)(2) asks about the status at entry, not whether an earlier period of residence became unlawful when a former status expired. When Cisneros returned in 1994, TPS had ended and DED supplied no replacement classification.

19

that qualify; it does not dispense with the status requirement altogether. Cisneros's reading would make "in any status" include those with no status at all. That is not what "any" means. "Any" means "whichever one" or "no matter which"—not "none." It ranges over members of a class; it does not erase the need to be a member of that class.

Cisneros's reading of "in any status" would render that language superfluous. Were we to read "in any status" to include *anyone* under *any circumstance*, then the statutory phrase simply collapses into "admitted"; the inquiry would end after a determination that the alien was admitted. *Tula Rubio v. Lynch*, 805 F.3d 185, 187 (5th Cir. 2015) (Jones, J., dissenting from denial of reh'g en banc) ("If the 7-year residence requirement runs from an alien's being 'admitted in any status,' and 'in any status' includes immigrants, non-immigrants, and illegal aliens, then what does 'status' exclude? What significance does it have in the provision?").

But "admitted in any status" differs from language in provisions like § 1255(a), which requires only that an alien be "inspected and admitted" and makes no mention whatsoever of the alien's "status" upon admission. *Accord Castillo Angulo*, 27 I. & N. Dec. at 197.[23] And because (1) we should assume that Congress acts intentionally when it includes particular language in one section of a statute and not in another, and (2) we should give effect to all parts of the statute, the phrase "in any status" in § 1229b(a)(2) must mean that there is at least some category of aliens who are not admitted "in any status." *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993); *Corley v. United States*, 556 U.S.

---

[23] While we do not defer to *Castillo Angulo*, its reasoning is persuasive insofar as it tracks the statute's text, structure, and history.

20

303, 314 (2009) (a "statute should be construed so that . . . no part will be inoperative or superfluous, void or insignificant") (cleaned up); *see also Martinez Gutierrez*, 566 U.S. at 587 (recognizing "status" as an immigration-law term of art and interpreting § 1229b(a)(2) to mean that "the alien must have lived in the United States for at least seven continuous years after a lawful admission, whether as an LPR *or in some other immigration status*") (emphasis added).  If "in any status" is to mean *anything*, Cisneros's interpretation cannot be right.[24]  *See Setser v. United States*, 566 U.S. 231, 239 (2012) ("[W]e must 'give effect . . . to every clause and word.'") (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)); *see also Lai Haw Wong v. INS*, 474 F.2d 739, 742 (9th Cir. 1973) (explaining that "mistaken admission conferred *no status, permanent resident or otherwise*, on [the aliens in question]").

The broader structure of § 1229b reinforces this conclusion.  Congress created a two-track system for cancellation of removal.  Subsection (a) provides a more favorable path for aliens who have been "admitted in any status," § 1229b(a)(2).  It requires three things: (1) having been "an alien lawfully admitted for permanent residence" for not less than five years; (2) seven years of continuous residence after having been "admitted in any status"; and (3) no aggravated-felony conviction.  § 1229b(a).  Subsection (b), by contrast, governs cancellation for aliens who have *not* been admitted in any status.  § 1229b(b)(1)

---

[24] Statutory terms generally take their technical meaning when the context indicates that Congress used a term of art like "status."  *See, e.g.*, *Hansen*, 599 U.S. at 774–75; *Van Buren v. United States*, 593 U.S. 374, 386–87 (2021); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012) ("Sometimes context indicates that a technical meaning applies.  Where the text is addressing a . . . technical subject, a specialized meaning is to be expected.").

21

("The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien . . ."). It requires four, more-demanding criteria: (1) ten years of continuous physical presence, (2) good moral character, (3) no conviction for a variety of offenses, and (4) the difficult showing that "removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." *Id.* An alien's place within this two-track structure turns on whether the alien was admitted in a recognized immigration status. If "admitted in any status" were read to encompass anyone who crossed the border after inspection—regardless of whether she possessed any legal status— then any alien who happened to pass through a port of entry rather than crossing without inspection would qualify for the subsection (a) track's more favorable treatment. Two identically situated aliens with no legal status would receive dramatically different treatment based solely on the happenstance of whether a border officer waved them through. The availability of cancellation relief does not turn on such fortuity.

The statute's history confirms that admission alone is not enough. When Congress enacted former § 212(c)—§ 1229b(a)(2)'s precursor—in 1952, it limited that provision's discretionary relief to aliens "returned to a lawful unrelinquished domicile of seven consecutive years." 8 U.S.C. § 1182(c) (1994) (repealed 1996). The courts of appeals divided over when "lawful domicile" began to accrue. This Circuit, like the Board, held that lawful domicile required LPR status. *See Chiravacharadhikul v. INS*, 645 F.2d 248, 250–51 (4th Cir. 1981). Other circuits took a broader view, recognizing lawful domicile

22

during periods of *any* lawful status. *See, e.g.*, *Lok v. INS*, 548 F.2d 37, 41 (2d Cir. 1977); *Castellon-Contreras v. INS*, 45 F.3d 149, 153 (7th Cir. 1995). But under either interpretation, the alien needed *a* lawful immigration status at some point—an alien who came illegally and remained without any sort of status was ineligible. *See, e.g.*, *Madrid-Tavarez v. INS*, 999 F.2d 111, 112–13 (5th Cir. 1993); *accord Castillo Angulo*, 27 I. & N. Dec. at 198.

Congress enacted § 1229b(a)(2) in 1996 against this backdrop. Its purpose, the Supreme Court has explained, was to reconcile the two competing readings of "lawful unrelinquished domicile," not to abandon the lawful-status-upon-entry premise on which both readings rested. *See Martinez Gutierrez*, 566 U.S. at 592–93. And because we presume that Congress legislates with knowledge of the settled judicial and administrative interpretations of the statutes that it amends, there is no reason to think that Congress intended to do away with the requirement that an alien hold a recognized immigration status when it enacted § 1229b(a)(2). *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 583 (1978); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–68 (1992).

We also reject the argument—advanced in *Tula Rubio* and *Saldivar* and pressed by Cisneros here—that the use of the phrase "lawfully admitted" in § 1229b(a)(1)—but not in § 1229b(a)(2)—shows that Congress intended for § 1229b(a)(2) to apply to aliens admitted with no recognized immigration status. *See Tula Rubio*, 787 F.3d at 294–95; *Saldivar*, 877 F.3d at 817.

"Lawfully admitted for permanent residence" in § 1229b(a)(1) is not "lawfully" plus "admitted." Rather, it is a single, unified term of art that "has nothing to do with

23

'admission' at all," and everything to do with status. *Azumah*, 107 F.4th at 276. Section 1101(a)(20) of the INA defines it as "the status of having been lawfully accorded the privilege of residing permanently in the United States." 8 U.S.C. § 1101(a)(20). The term encompasses aliens who obtained LPR status by any means, whether at the time of a physical ingress or through later adjustment of status while already in the country. *See Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1053 (9th Cir. 2014). It does not refer to a physical ingress. By contrast, "admitted in any status" in § 1229b(a)(2) *does* refer to a physical ingress: The alien must have been "admitted," that is, she must have made a "lawful entry . . . after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). And she must have held status when she returned.

Because (a)(1) asks about the acquisition of a particular legal status—whereas (a)(2) asks about the circumstances of a physical ingress—the presence of "lawfully" in one and its absence in the other tells us nothing about whether "status" in (a)(2) includes those with no immigration status at all. The word "lawfully" in (a)(1) is part of an already-defined term of art, not a freestanding modifier that Congress deliberately included in one subsection but omitted from another. *See Saldivar*, 877 F.3d at 819–20 (Kozinski, J., dissenting) (explaining that § 1229b(a)(1) refers to acquisition of permanent resident status, not physical entry, while § 1229b(a)(2) refers to the alien's immigration classification when she first enters the country); *accord Castillo Angulo*, 27 I. & N. Dec. at 202. The operative work that "in any status" does in (a)(2) is to require that the alien have held a recognized immigration status at the time of her physical admission; it does

24

not expand the universe of qualifying statuses to include the absence of any status whatsoever.[25]

For these reasons, Cisneros's attempts to bring DED within the meaning of "any status" are unpersuasive.[26]

\*                 \*                 \*

Cisneros was not admitted "in any status" within the meaning of § 1229b(a)(2) when she returned as a DED beneficiary.  DED deferred her removal; it did not give her status. Section 1229b(a)(2) demands status.  Only Congress can create status under the INA.  The Executive can defer enforcement; it cannot confer a place in the statutory scheme Congress wrote.  The petition for review is therefore

*DENIED*

---

[25] *See also Tula Rubio*, 805 F.3d at 189–90 (Jones, J., dissenting) (observing that "'[l]awfully admitted for permanent residence' is a specific type of status—LPR status—rather than a generic phrase for any alien who is legally allowed to be present" and that "no other legally recognized statuses use the word 'lawful' as a descriptor") (citing 8 U.S.C. §§ 1101(a)(15)(A)–(V)).

[26] We also reject Cisneros's claim that her due process rights were violated because no transcript of the November 2018 hearing exists.  As the Board concluded, the absence of the transcript neither rendered the proceedings fundamentally unfair nor prejudiced their outcome.  *Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008).  It was not fundamentally unfair because she was still able to address the merits of her cancellation of removal claim on appeal.  And Cisneros has failed to show how the lack of the transcript prejudiced her: This case turns on a question of law and no party's concession can bind this Court.  *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024).  Therefore, Cisneros failed to demonstrate a violation of her due process rights.

THACKER, Circuit Judge, dissenting:

As the majority explains, cancellation of removal is a discretionary form of immigration relief for which noncitizens are statutorily eligible only if they have been (1) "lawfully admitted for permanent residence" for at least five years; (2) have "resided in the United States continuously for 7 years after having been admitted in any status"; and (3) and have "not been convicted of any aggravated felony." 8 U.S.C. § 1229b(a). In this case, the only question before us is whether Alejandra Cisneros ("Petitioner") was "admitted in any status" in 1994 when the immigration officer stamped her passport "Admitted."

I agree with the Fifth and Ninth Circuits. Like those courts, I would conclude that Petitioner was "admitted in any status" on December 14, 1994, when an immigration officer stamped her passport "Admitted." Accordingly, I dissent.

I.

First, rather than assuming as the majority does that Petitioner was admitted on December 14, 1994, I would hold that she clearly was.

The Immigration and Nationality Act (the "INA") defines "admission" and "admitted" to mean, "with respect to a [noncitizen], the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). As we have long recognized, "a noncitizen is 'admitted' to the United States for purposes of the INA when she enters with 'procedural regularity' by physically presenting herself at a port of entry for inspection and questioning by an immigration official." *Mauricio-Vasquez v. Whitaker*, 910 F.3d 134, 136 (4th Cir. 2018)

26

(quoting *Matter of Quilantan*, 25 I. & N. Dec. 285, 293 (B.I.A. 2010)). And entry with "procedural regularity doesn't require entry on a particular visa or status." *Id.* In other words, admission can occur separate and apart from the status a noncitizen holds or does not hold.

Related but distinct from admission is the concept of parole. The "Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis . . . any [noncitizen] applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). But "parole . . . shall not be regarded as an admission of the [noncitizen]." *Id.* The Secretary has authorized immigration officers at points of entry to grant parole in their exercise of discretion. 8 C.F.R. § 212.5(a). Immigration officers "may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any [noncitizen] applicant for admission, under such terms and conditions . . . as he or she may deem appropriate." *Id.* § 212.5(c). Noncitizens already present in the country may apply for advanced parole. *Id.* § 212.5(f). If the application is granted, the noncitizen "shall be issued an appropriate document authorizing travel," which the noncitizen should present to the immigration officer upon reentry. *Id.*

At points of entry, immigration officers have passport stamps to identify whether an entry is an admission or a grant of parole. The only other option an immigration officer has is to deny entry. "[A]ny procedurally proper entry into the United States that is not parole is an 'admission.'" *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 n.11 (5th Cir. 2022).

27

Here, the immigration officer exercised their discretion and stamped Petitioner's passport "Admitted."

Nonetheless, the IJ and BIA determined that Petitioner was paroled into the country in 1994, despite the "Admitted" stamp in her passport. They reasoned that because Petitioner had been granted advanced parole and DED, she could only possibly have been paroled. Petitioner argues that holding is incorrect as a matter of law. In her view, because she entered the country in a procedurally regular way (by flying into Dulles and going through customs) and presented herself to an immigration officer for inspection (including by presenting her advanced parole document), and because the immigration officer conveyed to her that she was admitted (through the "Admitted" stamp in her passport), she is admitted. I agree.

The Government argues that because Petitioner had been granted advanced parole, she could only have been paroled into the country despite the stamp's clear statement: "Admitted." In the Government's view, the "Admitted" stamp must be chalked up to a mistake, and we must instead read it to mean "paroled." I would do no such thing. The Government's position defies logic and reality.

Petitioner entered the country in a procedurally regular manner when she appeared at a port of entry for inspection and authorization. *See Mauricio-Vasquez*, 910 F.3d at 136. The immigration officer, who I assume was competent, had just two stamps at their disposal -- just two choices: "Admitted" or "Paroled." While Petitioner did have an advanced parole document, the immigration officer exercised their discretion to stamp Petitioner's passport "Admitted." That was all that was required to render her admitted.

28

After all, the INA gives immigration officers discretion to authorize admission, and, absent some false claim of citizenship, it is not for us to second guess whether the immigration officer actually meant something other than "Admitted.". Particularly where, as here, the intent of the officer is clear given that literally in black and white. *See* 8 U.S.C. § 1101(a)(13)(A) (defining "'admission' and 'admitted' [to] mean . . . the lawful entry of the [non-citizen] into the United States after inspection and *authorization by an immigration officer*" (emphasis supplied)); *see also Matter of Quilantan,* 25 I. & N. Dec. 285, 291, 293 (B.I.A. 2010) (explaining that an admission occurs when a noncitizen "presents herself for questioning and makes no knowing false claim to citizenship," and the officer "communicates to the applicant that he has determined that the applicant is not inadmissible").

## II.

Next, I would conclude that Petitioner was admitted "in any status."

## A.

Although we have not considered what it means to be admitted "in any status," the Fifth and Ninth Circuits have. Both have concluded that § 1229b(a)(2)'s requirement that an admission be "in any status" does not "impose[] an additional requirement that a[] [noncitizen] must satisfy in addition to being admitted to the United States." *Tula-Rubio v. Lynch*, 787 F.3d 288, 293 (5th Cir. 2015). The petitioner in *Tula-Rubio* entered the United States as a passenger in a car that was waved through a port of entry. *Tula-Rubio*, 787 F.3d at 290. Though Tula-Rubio was lawfully admitted by virtue of that wave through entry, he had no documentation or claim to any lawful immigration status. Thus, when

29

Tula-Rubio applied for cancellation of removal pursuant to § 1229b(a), the BIA found him to be ineligible. *Id.* But the Fifth Circuit vacated that decision and concluded that Tula-Rubio had been "admitted in any status."

The court began by recognizing that "[a]lthough the word 'status' is not defined in the INA, its general meaning is '[a] person's legal condition.'" *Tula-Rubio*, 787 F.3d at 293 (quoting Black's Law Dictionary 1542 (10th ed. 2014); Merriam-Webster's Collegiate Dictionary 1220 (11th ed. 2007) (defining "status" as "the condition of a person or thing in the eyes of the law")). And "it is well settled that 'the word "any" has an expansive meaning, that is, one or some indiscriminately of whatever kind.'" *Id.* (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008)). Thus, the Fifth Circuit concluded that "in any status" is an unambiguous phrase that "broadly encompasses all states or conditions, of whatever kind, that a[] [noncitizen] may possess under the immigration laws." *Id.*

In application, the Fifth Circuit explained,

> [T]he phrase "any status" naturally encompasses those [noncitizens] whose status allows them to lawfully remain in the United States after admission, as well as those [noncitizens] in an unlawful status. The use of the term "any," without qualifying language such as *lawful* or *legal* to modify the word "status," requires us to broadly define the phrase to include [noncitizens] admitted in an unlawful status.

*Tula-Rubio*, 787 F.3d at 294 (emphases in original). "That Congress did not also specify a particular status or that the status be lawful in § 1229b(a)(2), but instead used the word 'any,' makes clear that no specific status, lawful or otherwise, is necessary to satisfy this requirement." *Id.*

30

The *Tula-Rubio* court also explained that this reading of "in any status" comports with the use of the term "status" throughout the INA. *See Tula-Rubio*, 787 F.3d at 295; *see also Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) ("[I]dentical words used in different parts of the same act are intended to have the same meaning." (citation omitted)). The Fifth Circuit noted that the INA refers to both "immigrant status" and "nonimmigrant status," as well as to noncitizens "who are 'in unlawful immigration status,' 'lawful status,' and 'lawful nonimmigrant status.'" *Tula-Rubio*, 787 F.3d at 295 (quoting 8 U.S.C. § 1255(c)). These references "confirm[] that the term status encompasses both lawful *and unlawful* legal conditions under the INA." *Id.* (emphasis in original).

When it was presented with the same question, the Ninth Circuit adopted the Fifth Circuit's reasoning and reading of § 1229b(a)(2). *See Salvidar v. Sessions*, 877 F.3d 812, 816 (9th Cir. 2017) ("[W]e join the Fifth Circuit in concluding that the plain meaning of the phrase 'any status' unambiguously includes all states or conditions, of whatever kind, that a[] [noncitizen] may possess under the immigration laws, including any lawful or unlawful status." (cleaned up)). In further support of this conclusion, the Ninth Circuit explained that the Government's attempt to write in "lawful status" was "facially incorrect" because "the word 'lawful' is conspicuously absent from the broadly inclusive phrase 'in *any* status' in § 1229b(a)(2)." *Id.* at 817 (emphasis in original). "One need look no further than § 1229b(a)(1), the immediately preceding provision, to confirm that Congress understands the necessity of using the word 'lawful' or 'lawfully' when it intends to be restrictive." *Id.*

31

And the Ninth Circuit explained that reading "in any status" to include lawful and unlawful status does not "render the phrase 'in any status' surplusage." *Saldivar*, 877 F.3d at 818. Because § 1229b(a)(1) requires that a noncitizen have been "lawfully admitted for permanent residence" for at least five years, the use of "in any status" in § 1229b(a)(2) for the continuous residency requirement "serves to distinguish § 1229b(a)(2) from § 1229b(a)(1)." *Saldivar*, 877 F.3d at 818.

The majority disregards the reasoning of both the Fifth and Ninth Circuits because it views "status" as a term of art that inherently means "membership in a specific, congressionally defined class," *supra* at 11, otherwise known as "lawful status," *see Tula-Rubio*, 787 F.3d at 295. The majority does so despite the fact that "status" is not defined in the INA, nor does the INA limit its view of "status" to the classifications it creates. Moreover, the majority takes this view because it defines status as "belonging to a defined class, with membership in that class creating a durable entitlement that is claimable against others, including the state." *Id.* at 9. Importantly, however, the Black's Law Dictionary definition offered by the majority recognizes that "status" can be defined both by the "capacities *and incapacities* which determine a person to a given class." *Id.* (quoting *Status*, Black's Law Dictionary 1580 (4th ed. 1951)) (emphasis supplied). Certainly, noncitizens with no lawful status have the incapacity of asserting any right to presence in the United States. And such noncitizens are part of a given class: unlawful status.

As both of our sister circuits aptly explain, Congress knows how to require "lawful status" or membership in a particular INA-created status when it wants to do so. By not including such a requirement in § 1229b(a)(2), Congress made clear that it did not intend

32

to "impose[] an additional requirement that a[] [noncitizen] must satisfy in addition to being admitted to the United States." *Tula-Rubio*, 787 F.3d at 293. And it is not our job to rewrite the statute. "In short, any is any, and a status is a status, be it lawful or unlawful." *Saldivar*, 877 F.3d at 819.

## B.

Sidestepping this reasoning, the majority pivots and concludes that even if "in any status" includes "unlawful status," Petitioner could not have held such a status.

In the view of the majority, "unlawful status" does not arise from the mere lack of lawful status or the expiration of it. Instead, the majority concludes -- without any supporting citation -- that Petitioner could not have been in unlawful status unless she "*unlawfully obtained* or *has violated*" the conditions of a "recognized immigration status." *Supra* at 17 (emphases in original). Thus, the majority concludes that because Petitioner's TPS expired in June 1992 and "DED supplied no replacement" status, she "held no status— she was simply a[] [noncitizen] present in the United States without one." *Id.*

I see things differently. For the reasons explained in *Tula-Rubio* and *Saldivar*, I would conclude that "any status" includes "unlawful status." And I would conclude that Petitioner was admitted in unlawful status in December 1994 because she was admitted without belonging to an INA-created classification and because her earlier TPS had expired.

First, the INA itself recognizes the existence of "unlawful status." Take as an example 8 U.S.C. § 1255a, which provides a legalization process for certain noncitizens who entered the United States before 1982 and have "resided continuously in the United

33

States in an *unlawful **status*** since such date and through the date the [legalization] application is filed under this subsection." 8 U.S.C. § 1255a(a)(2)(A) (emphasis supplied). The majority claims I read § 1255a with a "gloss," and that the statute really asks courts to consider "whose *presence* was unlawful enough to need legalizing," rather than being concerned with status. *Supra* at 18 n.22 (emphasis in original). On the contrary, the statute plainly says what it means -- it applies to those noncitizens who have "resided continuously in the United States in an *unlawful **status***." 8 U.S.C. § 1255a(a)(2)(A).

Consider, too, that "unlawful status" encompasses more than those noncitizens who unlawfully obtain or violate the conditions of a lawful status. In *Orquera*, we were tasked with deciding whether the petitioners, who had applied for legalization pursuant to § 1255a, had resided in the United States in unlawful status after their B-2 visitor visas expired on January 1, 1982. *Orquera v. Ashcroft*, 357 F.3d 413, 415 (4th Cir. 2003). The problem for petitioners was that, in addition to their B-2 visas, they had also been "accredited, as consular employees or family of such employees, with A-2 visas." *Id.* Because they possessed A-2 visas, the Immigration and Nationalization Service ("INS")[1] determined that petitioners were not in "unlawful status" after the expiration of their B-2 visas. *Id.* at 415–

---

[1] "Before the Homeland Security Act, federal immigration laws and regulations were administered by the [INS] . . . . The Homeland Security Act abolished the INS and transferred most of its functions to three new entities: [United States Citizenship and Immigration Services ("USCIS")], U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Patrol (CBP)." *Mestanek v. Jaddou*, 93 F.4th 164, 170 (4th Cir. 2024). "[T]he Homeland Security Act generally assigned INS's adjudicative functions to USCIS." *Id.* (citing 6 U.S.C. § 271(b)); *see also* Delegations of Authority Regarding Immigration Laws, 68 Fed. Reg. 10,922 (Mar. 6, 2003) (codified at 8 C.F.R. pts. 1, 2, 103, 239).

34

16.  It reasoned that "an A–2 visa holder was not in 'unlawful status' as of January 1, 1982, unless prior to that date the employment underlying the issuance of the A–2 visa had terminated, or the Secretary of State had withdrawn recognition of the A–2 visa." *Id.* at 423.

In reviewing that decision, we explained that the statute "does not define 'unlawful status' at all." *Orquera*,357 F.3d 424.  But we concluded that the INS "generally considers an applicant [for legalization] to be in unlawful status . . . *if the applicant's legal status has expired or otherwise terminated*, e.g., [8 C.F.R.] § 245a.2(b)(6), (12), *or* if the applicant has violated the terms of his legal status such that he is 'amenable to deportation proceedings.'" *Id.* at 425 (emphasis supplied) (citation omitted).  "Both of these conditions (expiration or violation of status) place an individual in direct jeopardy of deportation." *Id.* (emphasis omitted).  *Orquera* deferred to that definition pursuant to *Chevron*, finding that it was a reasonable construction of the statutory term.  *Id.*  Thus, while the petitioners had remained in the United States following the expiration of their B-2 visa, they were not "amenable to deportation proceedings" because of their A-2 status and so they were not in "unlawful status." *Id.*

Though we are no longer required to defer to agency interpretations of statutory terms, "prior cases that relied on the *Chevron* framework . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).  The majority chastises that we "should [not] adopt a deference-driven gloss on one program as the best reading of a different statutory provision." *Supra* at 19 n.22.  But the Immigration Reform and Control Act, which

35

encompasses § 1255a, was enacted as part of, and as an amendment to, the INA.  Pub.L. No. 99-603, Section 1(b) (1986).  Thus, its terms should generally be interpreted consistently with other provisions of the INA.  *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (recognizing that "a legislative body generally uses a particular word with a consistent meaning in a given context").  In any event, it is not my contention that *Orquera* directly controls this case.  Rather, *Orquera* recognizes the existence of unlawful status, as opposed to merely unlawful presence, and makes clear that despite the lack of a statutory definition, the agencies tasked with administering our immigration laws have long considered "unlawful status" to include noncitizens like Petitioner, whose recognized status expired.

Similarly, the USCIS policy manual itself explains that a noncitizen "is in unlawful immigration *status* if he or she is in the United States without lawful immigration status *either* because the [noncitizen] *never had lawful status or* because the [noncitizen's] *lawful status has ended*."  7 USCIS-PM B.3(B), https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-3 [https://perma.cc/5J2E-4MUN] (emphases supplied).  This included those "[w]ho entered the United States without inspection and admission or parole" and those "[w]hose lawful immigration status expired or was rescinded, revoked, or otherwise terminated."  *Id.*

In my view, this is the better definition of "unlawful status."  We know that the INA recognizes "unlawful status."  And if "unlawful status" is to mean anything, common sense indicates that it means the absence of lawful status.  The majority claims that this is simply "unlawful presence," and that presence is not the same as status.  *Supra* at 18.  Respectfully,

36

I disagree. Consistent with the USCIS manual, and with the Fifth and Ninth Circuits, I would conclude that any noncitizen present the United States possesses a status, be it lawful or unlawful. I would conclude that when Petitioner's TPS expired, she remained in the United States in "unlawful status." And when she was admitted in December 1994, that admission, too, was in unlawful status -- whether that is because her earlier TPS had expired or because she simply possessed no lawful status at the time of that admission.

### III.

I would hold that admission "in any status" includes an admission in "unlawful status," and find that Petitioner satisfied that requirement here. Therefore, I would grant the petition.